UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

A. LEONEL SUAREZ,

                   Plaintiff,                           Case No. 03-73973

vs.                                        HONORABLE NANCY G. EDMUNDS
                                           HONORABLE STEVEN D. PEPE

DEARBORN ORTHOPEDIC ASSOCIATES, P.C.
PROFIT SHARING PLAN AND TRUST;
DEARBORN ORTHOPEDIC ASSOCIATES, P.C.;
GREGORY W. HOUSNER and
JEFFREY T. WALDROP,

                   Defendants.
_____/

## REPORT AND RECOMMENDATION

      Both parties have filed dispositive motions which have been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). This litigation arises from a dispute between a retirement savings plan and its administrators (collectively, Defendants) and a participant (Plaintiff) regarding the amount of money Plaintiff is entitled to receive pursuant to his retirement. Plaintiff filed suit alleging violations of the Employment Retirement Income Security Program ("ERISA"), 29 U.S.C. §§ 1001-1461. For the reasons that follow, IT IS RECOMMENDED that Plaintiff's Motion to Reverse the Plan Administrator's Decision be GRANTED and Defendant's Motion for Summary Judgment Under FRCP 56(a) To Affirm Plan Administrator's Decision be DENIED.

## I.    FACTUAL BACKGROUND

      Plaintiff, a medical doctor, was employed with Defendant Dearborn Orthopedic Associates, P.C., and was a participant in the Dearborn Orthopedic Associates, P.C. Profit Sharing Plan and

Trust (the "Plan") (the Plan documents are attached to the Joint Appendix (J.A.), Exhs. A, B and C). The Plan has approximately 31 participants (J.A., Exh. G), and is self-described as a defined contribution plan whereby the participants can make contributions toward their individual profit sharing retirement funds and Orthopedic Associates, P.C. contributes funds towards a retirement fund for the participants (J.A., Exh. B). The Plan's trustees are defendants Gregory Housner and Jeffrey Waldrop (Complaint, p. 3), who are both participants in the Plan (Dkt. # 24, p.3).[1]

On August 1, 2000, Plaintiff wrote Defendants Housner and Waldrop, informing them that he intended to terminate his employment in mid-October and that he wanted his share of the trust to be segregated by the end of August when an accounting was set to be completed (J.A., Exh. D).[2] In this same letter Plaintiff acknowledged that this segregated account would still be held within the Plan and that it would continue to receive monthly contributions and contain the same "mix of stocks, bonds, annuities, etc., held in the general account" (*Id*.). Plaintiff further explained that he intended to roll the segregated account into his private IRA account upon his termination in mid-October (*Id*.).

On or about September 26, 2000, the Plan's trustees elected to change investments advisors from First Union to Morgan Stanley Dean Witter (Complaint, ¶ 17; Answer, ¶ 17). The parties dispute whether Plaintiff agreed to this decision. Plaintiff argues that he felt it was too great a risk and Defendants argue that Plaintiff was in support of the decision (Complaint, ¶ 18; Answer, ¶ 18).

_____

[1]Plaintiff served as a trustee for the Plan prior to being replaced by Defendant Waldrop on February 24, 2000 (Complaint, ¶ 14; Answer, ¶ 14).

[2]This Court can find no Plan provision which would allow a participant to elect to segregate their share of the Trust in this manner.

2

Although Plaintiff had not reached Normal Retirement Age[3] at the time of his termination, as of December 31, 2000, Plaintiff was fully vested in the Plan and had a balance of $1,747,293.54, approximately 59% of the trust (J.A., Exh. G). The Plan does not authorize an "Early Retirement Date" (J.A., Exh A, p. 9), but a participant may elect to have their vested assets distributed to them after termination as described below.

Plan Section 2.4.1 states that a participant's "Distributable Benefit" is that which he is entitled to collect upon the termination of his employment, and is equal to the "vested and nonforfeitable interest in his Accounts as of the Distribution Date" (J.A., Exh B, p. 21). The parties agree, as initial matters, that (a) the Distribution Date, defined by the Plan as the correct date for valuing Plaintiff's share of the trust, is December 31, 2000, and (b) funds should normally have been distributed to Plaintiff within a reasonable period after December 31, 2000, given Plaintiff's termination date (see Dkt. #35, p. 2 and Dkt. #36, p. 8).[4]

On December 11, 2000, after Plaintiff's termination, Plaintiff sent a letter to Defendants indicating to which IRA account he wanted his share of the trust's funds transferred (J.A., Exh. F). Yet, because Plaintiff was married, Plan Section 2.5.2 (e) dictated that his share of the Trust be

---

[3]Plaintiff's date of birth is July 22, 1944 (J.A., Exh. F). "Normal Retirement Age" for the Plan is age 65, and Plaintiff's "Normal Retirement Date" would have been August 1, 2009 (J.A., Exh. A, p.8-9).

[4]This apparent stipulation is in keeping with the Plan, as Section 2.4.5 (J.A., Exh. B, p. 22-23) states that the Distribution Date (what is more commonly referred to in retirement plans as a valuation date) shall, for the purposes of determining the amount to be distributed, be determined in a manner specified in the Adoption Agreement, and further instructs that distribution itself shall occur within a reasonable period after the Distribution Date. The Adoption Agreement defines the Distribution Date as the Anniversary Date coinciding with or following the date of termination (J.A., Exh. A, p. 19). The Anniversary Date is the last day of the Plan Year (J.A., Exh. A, p. 7), which would appear from the Plan documents to be January 31st (J.A., Exh. A, p.2), but the parties agree is December 31st.

distributed in the form of a Joint and Survivor Annuity unless the proper consents were submitted by both Plaintiff and his spouse (J.A., Exh. B, p. 31). Therefore, no action was taken by Defendants to distribute Plaintiff's assets until February 27, 2001, when Defendants first prepared the necessary paperwork (J.A., Exhibit H). Defendants contend that this delay was due to the fact that they were unable to reach Plaintiff before this time because he was traveling in Mexico and therefore inaccessible, but fail to show any attempts to try to reach him.

Plaintiff completed the forms the Defendants sent, i.e., the Benefit Election Form, Participant Release Form, Participant's Rollover Election Form, Waiver Of Plan's 30-Day Distribution Waiting Period and Qualified Joint and Survivor Annuity Waiver Form (collectively the "distribution paperwork") and returned it to Defendants on March 22, 2001. The "Participants Release Form" sent to Plaintiff by Defendants as part of this paperwork, indicates that Plaintiff was to receive the full $1,747,293.54 that was in his account as of December 31, 2000 (J.A., Exhibit. H).

The major point of contention in this case is Defendants' claim that they were authorized to revalue Plaintiff's share of the trust to account for market fluctuations up until the distribution paperwork was received by them. Plaintiff argues that the sole purpose of the paperwork was arranging for the distribution of the funds which had no effect on the valuation of his share of the trust, which was finally determined as of December 31, 2000. The distinction is important because the trust suffered significant market loss in early 2001.[5] Defendants argue that Plaintiff's share of the trust was reduced by $285,480.85 due to market loss between the time his share was initially

---

[5]This parties do not dispute the fact that the trust suffered a loss during this time period, but the only evidence of said loss before this Court is Joint Appendix Exhibit M, which is a one page typewritten document indicating the extent of the loss for Plaintiff's account only. No actual account statements for the Plan are included in the Joint Appendix.

4

valued on December 31, 2000, and March 22, 2001, when the paperwork was received by Defendants (J.A., Exh. M).  Plaintiff argues that the Plan's language dictates that his share of the trust was to be finally valued as of December 31, 2000, and that the specific amount then calculated, $1,747,293.54, was to be distributed to him within a reasonable time thereafter.[6]

A year of negotiations resulted in a check being sent to Plaintiff on February 14, 2002, for $1,504,380.64, the value of Plaintiff's account less the disputed loss (J.A., Exh. XYZ).[7]

Plaintiff filed his complaint on October 2, 2003 (Dkt. #1), asserting jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).  Discovery closed on April 15, 2004 (Dkt. #4), and the parties submitted a Joint Appendix which was to constitute the entire administrative record on October 25, 2004 (Dkt. #22).  A hearing before the undersigned was held on February 11, 2005, after which the Court requested and received additional briefs on the issues of notice and the effect of a plan participant who chooses to keep his funds in the Plan after retirement (Dkt. #28). Defendants replaced their attorney on March 16, 2005 (Dkt. #30).

II.   <u>ANALYSIS</u>

A.   <u>The Administrative Record</u>

Congress passed ERISA to protect participants in employee benefit plans by requiring

---

[6]Plaintiff also argues that it was the Trustee's decision to change investment advisors which caused the Trust to lose assets in early 2001.  On October 2, 2001, Plaintiff provided Defendants with a projected earning statement, completed by a James Bond, indicating what the trust would have earned had it remained with First Union (J.A., Exh. Q), and on January 25, 2002, Plaintiff suggested the trustees could resolve the dispute between the parties regarding Plaintiff's account by agreeing, in part, to bring an action against Morgan Stanley and the others responsible "for the wholesale sale and reinvestment" of Plaintiff's account (J.A., Exh. U).  Yet, this argument is without merit as Plan Section 3.6.1 grants the Trustees' discretion to act as they did in choosing to hire Morgan Stanley as their investment advisor (J.A., Exh B, p. 77).

[7]This check had to be reissued due to expiration (J.A., Exh. 1A and 1B).

employee plans to meet minimum standards and allowing for judicial review in federal courts.  29 U.S.C. §1001(b).  Section 1132(a) allows a participant to file suit in federal court to enforce the terms of their ERISA-covered employee benefit plan.  In claims without a procedural challenge to the administrator's decision, the Sixth Circuit limited judicial review to "evidentiary materials contained in the administrative record." *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring) (citing *Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th Cir. 1990)).  The limitation of judicial review to the administrative record is to effectuate Congress's intent in drafting ERISA, creating a mechanism for disposition which "does not neatly fit under either Rule 52 [Bench Trial] or Rule 56 [Summary Judgment]." *Wilkins,* 150 F.3d at 619.

On September 3, 2004, Judge Edmunds issued an order requiring the parties to submit a "joint appendix consisting of all pertinent plan documents and the administrative record" (Dkt. 14).  On October 25, 2004, the parties submitted a Joint Appendix, containing over two hundred pages within thirty-one exhibits.  Contained in the Joint Appendix as the sum of the Plan's documents are the following:

Exhibit A - Adoption Agreement for the Datair Mass-Submitter Prototype Non-Standardized Profit Sharing Plan and Trust,

Exhibit B  - Datair Mass-Submitter Defined Contribution Plan and Trust, and

Exhibit C - Summary Plan Description.

Defendants retained new counsel on March 16, 2005 (Dkt. #30).  On April 11, 2005, Defendants submitted for the first time in this matter a document entitled "Part 3, Article 1, Accounting" attached as Exhibit A to Defendants' Brief Addressing February 11, 2005, Hearing Issues (Dkt. # 35), which Defendants allege *may* be pertinent to this matter (Dkt. #37) as an alleged

amendment to the version of the Plan in the Joint Appendix (J.A., Exh. B, p. 55). Defendants also, for the first time, submitted as Exhibit G to the supplemental brief, minutes of a special meeting of the shareholders, directors, and profit sharing plan trustees, which is dated April 20, 2001. At no point did Defendants seek leave of the court to formally amend or supplement the Joint Appendix to include these documents. Plaintiff vigorously objects to the inclusion of these new documents on the grounds that the administrative record had already been established by the parties, pursuant to Judge Edmunds Order. Before analysis can begin, this Court must determine which documents constitute the administrative record.

Judge Edmunds's order of September 3, 2004, set deadlines by which parties were to submit motions for summary disposition and the Joint Appendix. The purpose of the order was to expedite disposition of the case by clarifying which factual and legal issues remain. *See* FED. R. CIV. P. 16(a). Defendants have not attempted to formally amend the Joint Appendix, and cannot supplement the record unilaterally. *See H. Hackfeld & Co. v. U.S.,* 197 U.S. 442, 446 (1905) (holding that factual stipulations by parties are binding on the court). The purported plan amendment contains no reference to a specific plan nor any date of adoption that would assist this Court in determining whether this document is now or ever was relevant to the Plan at issue, much less if it was in place at the relevant time period. In fact, while not dispositive, the pagination on the purported amendment is inconsistent with the page numbers listed on "Part 3" of the Plan contained within the Joint Appendix (J.A., Exh. B, p. 55). Further, it is also curious that (a) while the language of this amendment gives the Trustees the precise authority required to revalue Plaintiff's share of trust as

7

they did,[8] the amendment was never referred to in any correspondence to Plaintiff, nor any of the pleadings before this Court in the four years since Plaintiff first started to question the reasoning behind the reevaluation of his account, and (b) in Defendants' Reply Brief (Dkt. #37) they indicate that even they are not sure this amendment was in place at the relevant time period.

In sum, Defendants have not shown sufficient cause to modify the administrative record because of "new" evidence that, if relevant at all, must have existed and been in Defendants' possession for the entire course of this three-year litigation. Therefore, this Report will continue to consider the Joint Appendix as the complete administrative record.

### B.   Standard for Judicial Review of Plan Administrator's Actions

A Court will review the Plan Administrator's decision *de novo* unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When there is a "clear grant of discretion to the administrator," courts defer to the Administrator's decision, reviewing it only to see if it was arbitrary and capricious. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir.1994); *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir. 1991); *Brown v. Ampco-Pittsburgh Corp.,* 876 F.2d 546, 550 (6th Cir. 1989).[9]

Although Plaintiff argues otherwise, the Plan does grant discretion in interpretation to the Administrator. Section 1.2.33 defines a fiduciary of the Plan as the "Plan Administrator, the Trustee

---

[8]The amendment allows the trustee, at his sole discretion, to make a reevaluation of the trust fund before making a distribution to a participant whenever he, in good faith, determines that such is necessary in order "prevent the payee from receiving a substantially greater or lessor amount than what he would be entitled to, based on current values...."  Exhibit A.

[9]Yet, a plan is not required to use the term "discretionary" or some other similar terminology.  See *Johnson v. Eaton Corp.*, 970 F.2d 1569, 1572 n. 2 (6th Cir. 1992).

8

and any other person who has discretionary authority or control in the management of the Plan or

the disposition of the Trust assets" (J.A., Exh. B, p. 6).  Plan Section 3.3.10 states:

> Except for the right of a Participant or Beneficiary to appeal the
> denial of a claim, any decision or action of the Plan Administrator or
> the Trustee made or done in good faith upon any matter within the
> scope of the authority and discretion of the Plan Administrator or the
> Trustee shall be final and binding upon all persons. *In the event of*
> *judicial review of actions taken by any Fiduciary within the scope of*
> *his duties in accordance with the terms of the Plan and Trust, such*
> *actions shall be upheld unless determined to have been arbitrary and*
> *capricious.*

(J.A., Exh. B, p. 69)(emphasis added).

The Plan expressly grants discretion to the Trustees, yet because the Administrative Record

in this matter is devoid of any documentation which would provide this Court with guidance as to

the Trustees' interpretation of the Plan's language with regard to this particular matter, the standard

of review must revert back to *de novo* review, as the Court has nothing to which to defer.  *Thompson*

*v. J.C. Penney Co., Inc.*,  2001 WL 1301751, *4 (6th Cir. 2001).

A court applying a *de novo* standard of review provides no deference to the Administrator's

decision, and conducts its review based on the record before the administrator.  *Perry v. Simplicity*

*Engineering*, 900 F.2d 963 (6th Cir.1990).

### C.    Exhaustion of Administrative Remedies

Although ERISA contains no explicit requirement that parties exhaust administrative

remedies prior to filing suit, courts have relied upon "[t]he administrative scheme" of the act in

reading in such a requirement.  *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir.

1991); *see also* 29 U.S.C. §1133(2) ("every employee benefit plan shall ... afford a reasonable

opportunity to any participant whose claim for benefits has been denied for a full and fair review

9

by the appropriate named fiduciary of the decision denying the claim").  The requirement of exhaustion is jurisdictional, but courts can excuse the requirement if resort to the administrative process would be futile or if the defendant waives the requirement.  *Costantino v. TRW, Inc.*, 13 F.3d 969, 974-75 (6th Cir. 1994)(allowing exception for futility); *Parson v. Union Underwear Co., Inc.*, 95 Fed.Appx. 144, 146, Slip Copy, 2004 WL 833055 at *1 (6th Cir. 2004) (allowing exception when it would be futile and parties stipulated that exhaustion had occurred).

In a September 3, 2004, order, Judge Edmunds required the parties to submit a statement regarding exhaustion of administrative remedies on or before October 25, 2004, (Dkt. #14).  On October 25, 2004, Defendants responded that "while Plaintiff and his Spouse failed to follow the Appeal procedures set forth in the [Plan], the retention of Counsel to represent them in their claim for additional benefits effectively waived that requirement" (Dkt. #19).  It is unclear what Defendants are trying to say with this statement.  Although they use language suggesting the requirement is "waived," they note that Plaintiff failed to follow the appeal process.  Because Defendants failed to raise exhaustion at any stage of the litigation, it will be considered waived.

Even if Defendants had raised it, the case would not be dismissed because resorting to the administrative process would have been futile.  *See Costantino*, 13 F.3d at 974-75.  Plaintiff and his attorney have spent years corresponding with Defendants over the determination of benefits, and Defendants' position is clear.  *See Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 419-420 (6th Cir. 1998) (finding a "futility exception" for a Plaintiff and his attorney who spent two years corresponding with Defendant in a "perpetual stalemate").  Further, excusing Plaintiff from exhaustion is consistent with the goals of the exhaustion requirement.  For instance, the factual record is well established, Defendants have had plenty of opportunity to correct any mistake, and

10

Plaintiff's claim is not frivolous.  *See id.,* at 420-21 (*citing Makar v. Health Care Corp. of Mid-Atlantic (Carefirst)*, 872 F.2d 80 (4th Cir. 1989)).

### D.    Review of the Administrator's Decision

Plaintiff seeks to alter Defendants' valuation of his account, arguing that the Trustee's were not authorized to revalue his account after the Distribution Date, December 31, 2000.  Plaintiff also seeks interest on the money that was ultimately paid, arguing that it was not distributed in a timely manner as required by the Plan.  Finally, Plaintiff argues that he was not provided sufficient notice of the Administrator's decision, as required by 29 U.S.C. § 1133(1), regulations, and the Plan's provisions.

### 1.    *Notice Requirement of § 1133*

ERISA requires that each employee plan "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. §1133(1).  Moreover, 29 C.F.R. § 2560.503-1(f)(1) (and Plan Section 3.9.1 using substantively identical language (J.A., Exh. B, p. 85) requires that, "if a claim is wholly or partially denied, the plan administrator shall notify the claimant ... of the plan's adverse benefit determination within a reasonable period of time."  The regulations require that the Plan provide:

> (I) The specific reason or reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the determination is based;
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review.

11

29 C.F.R. § 2560.503-1(g).

Plaintiff contends Defendants failed to provide sufficient notice to Plaintiff regarding the decision to not give Plaintiff his requested account valuation. In particular, he notes that he was not informed of reasons why he was being denied part of his retirement account. Defendants contend that Plaintiff was not "denied" benefits, but that this is merely a dispute about the proper rate of return.

Plaintiff raised the notice argument earlier, in his Statement of Procedural Challenge (Dkt. #16). Judge Edmunds explicitly rejected this argument in an Order dated October 4, 2004 (Dkt. #18). Because failure to provide notice under 29 U.S.C. § 1133 constitutes a procedural deficiency, and the Court has already determined no procedural challenge exists in this case, the claim of inadequate notice has already been rejected by the Court. *VanderKlok v. Provident Life & Acc. Ins. Co., Inc.*, 956 F.2d 610, 616-17 (6th Cir. 1992)(writing that failure to comply with § 1133 is a procedural violation). Therefore, the Court does not find any failure on the part of Defendants to provide notice.

### 2.     *Valuation of Plaintiff's Account*

Plan participants are permitted to elect to receive their benefit in different ways. Plaintiff chose to obtain his share in a lump sum payment, an option which required he and his spouse to fill out distribution paperwork, including consent forms, before payment could begin.[10]

---

[10]Plan Section 2.5.2(e) states that, unless a participant and his or her spouse provide written consent for an optional form of benefit, a married participant's vested account balance must be paid in the form of a Joint and Survivor Annuity (J.A., Exh. B, p. 30). Consent must be provided within the 90-day period ending on the annuity starting date (*Id.*), which is defined as "the first day of the first period for which an amount is payable as an annuity or any other form" (J.A., Exh. B, p. 34).

12

The parties agree that, because Plaintiff resigned before the end of the year in 2000, his Distribution Date was December 31, 2000. The parties disagree about whether the Plan's administrators were authorized to revalue his share of the trust after the Distribution Date but before his distribution took place.

Despite the fact that Plaintiff provided notice of his planned termination in August 2000, Defendants did not provide Plaintiff with the distribution paperwork until February 22, 2001. Defendants allege that they could not do so before this date because Plaintiff was out of the country and they were unable to reach him. Yet, nothing contained within the administrative record suggests that Defendants attempted to reach Plaintiff or that Plaintiff was inaccessible for the period before February 2001. The Record does include two letters from Plaintiff to Defendants wherein he attempted to take steps to close out his account prior to the end of 2000 (J.A., Exhs. D and F), which would seem to indicate that Plaintiff was accessible.

Yet, even if Defendants were justified in failing to provide Plaintiff the means to commence distribution, this cannot justify their taking action inconsistent with the clear language of the Plan. *See Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 849-50 (6th Cir. 2000). Plan Section 2.4.1 states that "[a]t such time that the employment of a Participant terminates for any reason, he or his Beneficiary shall be entitled to a benefit equal to the vested and non-forfeitable interest in his Accounts as of the Distribution Date" (J.A. Exh. B, p. 21).[11]

The Distribution Date, the date on which Plaintiff's share of the trust was to be determined,

---

[11]Although Defendants initially contended that the date of termination was the date Plaintiff turned in his forms (Dkt. #23, p. 10), they now allege that Plaintiff terminated his employment on November 6, 2000 (Dkt. #35, p. 2) which is, at any rate, a date before the end of 2000 which means the parties can agree that the applicable Distribution Date is December, 31, 2000.

13

is defined by the Plan as the Anniversary Date following the date of termination (J.A. Exh. A, p. 19 and Exh. B, p. 22), which the parties now agree is December 31, 2000. Defendants attempt to argue that Plaintiff's "delay" in submitting the distribution paperwork until March 22, 2001, allowed them to adjust his share of the trust after the Distribution Date to account for a downward market trend which allegedly occurred between the Distribution Date and the date they received the distribution paperwork. They are correct in noting that a delay in completing the paperwork must delay distribution of funds, but they have no support in the Plan's language for their argument that such delay alters the Distribution Date for purposes of valuation.

Defendants cite Section 2.5.1(b) of the Plan, which states that a "failure of a Participant and spouse to consent to a distribution <u>while a benefit is immediately distributable</u>... shall be deemed to be an election to defer commencement of payment of any benefit sufficient to satisfy this section," (J.A., Exh. B at 25)(emphasis added) for the proposition that Plaintiff's failure to submit the distribution paperwork before a certain date (unspecified by the Defendants) caused Plaintiff's benefits to be subject to this "Deferred Distribution" provision. Yet, this argument is without merit for two reasons.

First, it is undisputed that Plaintiff and his spouse did provide consent to the distribution on March 22, 2001. Therefore, because Plaintiff's account was still immediately distributable at that time,[12] the automatic deferral provision would not have been activated. Second, even if the automatic deferral provision had been activated, by the terms of "Deferred Distribution" provision,

---

[12]The Plan defines a participant's account as "immediately distributable" if "any part of the Participant's account balance could be distributed to the Participant ... before the Participant attains ... the later of age 62 or the Normal Retirement Age." In the present case Plaintiff's entire account was immediately distributable due to the fact that he was fully vested at termination and would not have reached the Normal Retirement Age until August 1, 2009.

14

Plan Section 2.5.1., upon deferral Defendants would have been required to segregate Plaintiff's share of the trust into a *Segregated Fund* as of the *Distribution Date* (J.A., Exh. B, p. 25).  Therefore, even if Plaintiff's distribution had been deferred the Distribution Date would not have been altered and the principle amount of Plaintiff's share of the trust would have remained the same.  Defendants still would not have been allowed to adjust the value of Plaintiff's Segregated Fund as they did, because, pursuant to Plan Section 3.6.4, Segregated Funds are not subject to "any net income or loss for, or net appreciation or depreciation in value of, any investments of the Trust Fund," and must be invested in interest-bearing accounts or certificates of deposit, unless the Trustee determines that an alternative investment is appropriate (J.A., Exh. B, p. 80).

It is not clear that Defendants actually interpreted the Plan as requiring that Plaintiff's distribution be deferred, due to the fact that they did not segregate his account nor defer his distribution until 2009 as the automatic deferral provision, had it been implemented, would have required.[13]  It is found that the automatic deferral provision does not apply in this matter because Plaintiff and his spouse provided consent for distribution while his account was still immediately distributable.

In sum, the plain language of Plan Section 3.1.2, allows for adjustments or revaluing of a participant's account only as of each Valuation Date (J.A., Exh. B, p. 55) and the Plan's Administrators may not simply ignore this fact in order to force Plaintiff to share in the unfortunate market loss suffered by the Trust.  The decision to revalue the account was not a reasonable interpretation of the Plan and therefore could not have withstood even the deferential "arbitrary and

---

[13]Plan Section 2.5.1(b)(iii), had it actually been implemented, would have required a deferral of distribution until 60 days after the close of the Plan Year in which Plaintiff attained Normal Retirement Age, i.e. 2009.

15

capricious" standard of review. It does not withstand this Court's *de novo* review. Plaintiff's share

of the Trust should have been finally valued as of December 31, 2000. Plaintiff is therefore entitled

to $242,912.90, the difference between the amount he received and the amount he should have

received with a proper valuation of his account, plus interest on this amount[14] compounded daily.

28 U.S.C. §1961; *Ford*, 154 F.3d at 616 (statutory postjudgment framework set forth in 28 U.S.C.

§ 1961 is a reasonable method for calculating prejudgment interest awards).

### 3.   *Delay in Payment of Undisputed Amounts*

Plaintiff also notes that he was not paid the undisputed amount of $1,504,380.64 until

February 14, 2002, even though he submitted his distribution paperwork on March 22, 2001. The

February 14, 2002, letter from Defendants' attorney accompanying the check suggests that the

reason for the delay was because Plaintiff did not sign updated consent forms (J.A., Exh. 1A). There

is nothing in the Administrative Record that explains why Plaintiff did not sign the forms, or

whether they were made available to him prior to that date, although Plaintiff likely would have

refused to sign the updated consent form due to the fact that in so doing he may have relinquished

the right to sue for the disputed amount (J.A., Exh. H).

Pursuant to Plan Section 2.4.6, Defendants had a duty to commence distribution within a

reasonable period (J.A., Exh. B, p. 23), which they breached by waiting until early 2002. Plaintiff

---

[14] The applicable interest rate should be calculated using the average 52-week U.S. Treasury bill rate over the relevant period. *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir., 1998).

is therefore entitled to interest[15] on the undisputed sum for the period between April 21, 2001,[16] and February 14, 2002, compounded daily.  28 U.S.C. §1961; *Ford*, *supra*, 154 F.3d at 616.

###    3.    ***Damages***

For the reasons mentioned above, Plaintiff is entitled to the difference, with interest, between the $1,504,380.64 he was paid on February 14, 2002, and the $1,747,293.54 his account was valued at as of the Distribution Date, December 31, 2000, or $242,912.90.  Interest on this amount should be compounded daily from April 21, 2001, until the judgment is paid.  *Ford*, supra, 154 F.3d at 616. He is further entitled to interest on the undisputed amount, $1,504,380.64, for the period between April 21, 2001, ( a reasonable time, thirty days, after Plaintiff submitted the distribution paperwork) and February 14, 2002, (when Defendants paid the undisputed amount).  *Id*.  Interest on this undisputed amount should be compounded daily from April 21, 2001, until February 14, 2002.  The applicable interest rate for both amounts should be calculated using the average 52-week U.S. Treasury bill rate over the relevant period.  *Id.*

The interest due Plaintiff should be calculated by the parties in accordance with 28 U.S.C. §1961 and *Ford* (*supra*, 154 F.3d 613), and a stipulated order determining the final amount due as of the date of Judge Edmunds ruling on this Report and Recommendation, as well as a per diem interest amount from that date forward, should be presented for the Court's approval within thirty days of Judge Edmunds ruling on this Report and Recommendation so that such may be included

---

[15]The applicable interest rate should be calculated using the average 52-week U.S. Treasury bill rate over the relevant period.  *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir., 1998).

[16]Plaintiff and his spouse submitted the distribution paperwork on March 22, 2001.  The Plan allows Defendants a reasonable time after this date in which to provide Plaintiff with his share of the Trust.  Therefore, April 21, 2001, thirty days after the distribution paperwork was submitted, was chosen as the date to begin prejudgement interest.

in the final judgement in this matter.

ERISA gives the court discretion to grant attorney's fees to either party. 29 U.S.C. §1132(g)(1). When considering an award of attorney's fees, the court may consider several factors, but reach a decision on a case-by-case basis. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1303-04 (6th Cir. 1991)(citing *Eaves v. Penn*, 587 F.2d 453, 465 (10th Cir. 1978)). Among the factors to be considered are: "(1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to personally satisfy an award of attorneys fees; (3) whether or not an award of attorneys fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position." *Eaves*, 587 F.2d at 465. Here, neither party litigated in bad faith, and neither party won on every issue. The complexity and closeness of the case was the reason for litigation, not a lack of effort to resolve prior to trial. Given the unique facts of this case, there would be no deterrent effect of an award of attorney's fees. While Defendants could satisfy an award of attorney's fees, doing so would hurt innocent participants in the Plan. Therefore, this Court declines to award attorney's fees.

## III.   RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Plaintiff's Motion to Reverse the Plan Administrator's Decision be GRANTED and Defendant's Motion for Summary Judgment under FRCP 56(a) to Affirm Plan Administrator's Decision be DENIED.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections

18

constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 23, 2005                               s/Steven D. Pepe
Ann Arbor, Michigan                                  United States Magistrate Judge

Certificate of Service

I hereby certify that copies of the foregoing were served upon the attorneys of record by electronic means or U. S. Mail on August 23, 2005.

                                                     s/William J. Barkholz
                                                     Courtroom Deputy Clerk

19